UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

FILED

2008 AUG 11 A 11:44

U.S. DISTRICT COURT
NEW HAVEN, CT

AYFER YALINCAK,
A No. A 73-393-720,

Petitioner,

v.

BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT; DEPARTMENT OF HOMELAND SECURITY; MICHAEL CHERTOFF, SECRETARY OF DEP'T OF HOM. SEC.; THOMAS HOGAN, SECRETARY OF B.I.C.E.; DISTRICT DIRECTOR FOR B.I.C.E., HARTFORD, CONNECTICUT; MICHAEL B. MUKASEY, ATTORNEY GENERAL OF U.S. DEP'T OF JUSTICE; AND WARDEN WAYNE T. SALISBURY, JR.,

Respondents.

Civil Case No.
3:08-cv-01193(JBA)

**AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**
**PURSUANT TO 28 U.S.C. §2241**

Petitioner, Ayfer Yalincak ("Mrs. Yalincak" or "Petitioner"), hereby petitions this Court for a writ of habeas corpus to remedy Petitioner's unlawful detention by Respondents. In support of this petition and complaint for injunctive relief, the Petitioner alleges as follows:[1]

**CUSTODY**

1. Petitioner is in the physical custody of the Respondents and U.S. Immigration and Customs Enforcement ("ICE"). Petitioner is detained at the Donald W. Wyatt Detention Facility located at 950 High Street, Central Falls, RI 02863. Upon information and belief, ICE has contracted with Donald Wyatt

1. Mrs. Yalincak's Amended Petition for A Writ of Habeas Corpus includes the Warden of Donald W. Wyatt as a Respondent. Warden Salisbury's name was not included in the original Petition.

to house immigration detainees such as Petitioner. At all times relevant hereto, the Petitioner is under the direct control of Respondents and their agents.

**JURISDICTION**

2. This action arises under the Constitution of the United States, and the Immigration and Nationality Act ("INA"), 8 U.S.C. §1101 et seq., as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L.No. 104-208, 110 Stat. 1570, and the Administrative Procedure Act ("APA"), 5 U.S.C. §701 et seq.

3. This Court has jurisdiction under 28 U.S.C. §2241; art. I §9, cl.2 of the United States Constitution ("Suspension Clause"); and 28 U.S.C. §1331, as Petitioner is presently in custody under color of the authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. This Court may grant relief pursuant to 28 U.S.C. §2241, 5 U.S.C. §702, and the All Writs Act, 28 U.S.C. §1651.

**VENUE**

4. Pursuant to Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484, 493-500 (1973), venue lies in the United States District Court for the District of Connecticut, the judicial district in which Petitioner resides.

5. Venue is also proper pursuant to 28 U.S.C. §1391.

**PARTIES**

5. Petitioner is a native and citizen of the Republic of Turkey. Petitioner was first taken into ICE custody on November 9, 2007, and has remained in ICE custody continuously since that date. Petitioner was ordered removed on January 16, 2008. Subsequently, the Petitioner filed a timely appeal to the Board of Immigration Appeals ("BIA") on February 14, 2008, which affirmed IJ Michael Straus, Hartford, Connecticut, Order of Removal, on May 22, 2008. Thereafter, the Petitioner filed a timely Petition for Review of her Order of Removal with The Second Circuit Court of Appeals pursuant to 8 U.S.C. §1252, and Motion to Reconsider with the BIA. Presently, both the Petition for Review and the Motion to Reconsider are pending, however, the Petitioner's removal has been stayed, absent objection by the Respondents. The Petitioner has been in custody now for approximately ten (10) months under INA §236(c), 8 U.S.C. §1226(c).

6. Respondent Bureau of Immigration and Customs Enforcement ("BICE"), is a division of the Department of Homeland Security responsible for the implementation and enforcement of the Imigration And Naturalization Act ("INA").

7. Respondent Department of Homeland Security ("DHS") is responsible for the administration of ICE and the implementation and enforcement of the INA.

8. Respondent Michael Chertoff is the Secretary of the Department of Homeland Security. He is responsible for the administration of ICE and the implementation and enforcement of the INA. As such, Mr. Chertoff is the legal custodian of the Petitioner.

9. Respondent Thomas Hogan is the Secretary of the Bureau of Immigration and Customs Enforcement. He is responsible for the administration of ICE and the implementation and enforcement of the INA. As such, Mr. Hogan is also a custodian of the Petitioner.

10. Respondent District Director for BICE is Director of the Hartford, Connecticut Field Office of ICE and is Petitioner's immediate custodian. See Vasquez v. Reno, 233 F.3d 688, 690 (2st Cir. 2000), cert. denied, 122 S. Ct. 43 (2001).

11. Respondent Michael B. Mukasey is the Attorney General of the United States Department of Justice and is responsible for the administration of ICE and the implementation and enforcement of the INA. As such, Mr. Mukasey has ultimate custodial authority over Petitioner.

12. Respondent Warden Wayne T. Salisbury, Jr., of the Donald W. Wyatt Detention Facility, where Petitioner is currently detained under the authority of ICE, alternatively may be considered the Petitioner's immediate custodian.

## FACTUAL ALLEGATIONS

### A. INTRODUCTION

13. Narrowly framed, this habeas corpus proceeding under 28 U.S.C. §2241 concerns the constitutionality of the prolonged detention of the Petitioner under INA Section 236(c), 8 U.S.C. §1226(c), while she awaits a decision from The United States Court of Appeals for the Second Circuit, docket no. 08-3014, on her Petition for Review of a final order of removal.

14. Respondents violated Petitioner's constitutional right to a meaningful individualized determination of her status pending adjudication of the validity of the removal order. Petitioner alleges that her incarceration by the Respondents while she contests her removal order is unreasonable and (1) violates her substantial and procedural right to due process; and (2) violates her right under the Equal Protection clause where similarly situated aliens, have been treated differently.

15. The Petitioner underscores that she is exclusively challenging her continued detention by the Respondents, not the merits of her removal order in this action.

16. The Petitioner has been held under 8 U.S.C. §1226(c), INA §236(c) since November 9, 2007.

17. Finally, the Petitioner does not assert an absolute right to bail, but only that she be allowed an individualized bail hearing to determine whether there are

conditions or a combination of conditions upon which she may be released.

B. **BACKGROUND**

18. The Petitioner is a 54 year old native and citizen of Turkey who entered this country in or about May 1992 on a B1/B2 non-immigrant visitor visa with her two minor children, Hale Yalincak (08/03/1987) and Hakan Yalincak (3/30/1984). The Petitioner's husband joined her in July 1992.

(i) Prior Immigration Proceedings

19. The Peitioner was charged and convicted by a plea of guilty in the State of Indiana on or about September 22, 1995 for a violation of section 25-22.5-8-1 of the Indiana Code, and sentenced to 4 years in prison and 4 years of probation. Upon information and belief, through postconviction relief, the Petitioner served a total of two years in prison on this charge.

20. On September 12, 1996, the predecessor to ICE, the Immigration and Naturalization Service ("INS") issued an Order to Show Cause charging the Petitioner with a violation of Section 241(a)(2)(A)(i) of the INA, conviction of a crime involving moral turpitude within five years and Section 241(a)(1)(B) of the INA, remained longer than permitted; and Section 241(a)(2)(a)(iii) of the INA, convicted of an aggravated felony.

21. On May 28, 1997, IJ Carlos Cuevas, Chicago, Illinois issued a written order and stated that the Petitioner's conviction for practicing medicine without a license in violation of Section 25-22.5-8-1 of the Indiana Code was neither a crime of moral turpitude nor an aggravated felony. (A copy of the written decision of IJ Cuevas is attached hereto as **Exhibit A**.)

22. Further, in the same May 28, 1997 Order, IJ Cuevas granted the Petitioner's request for a change of venue to Hartford, Connecticut.

23. In July 1997, the Petitioner was released on $5,000.00 bond by IJ William P. Joyce in Hartford, Connecticut. The Petitioner subsequently applied for asylum and witholding of removal under the INA.

24. On or about April 4, 1998, IJ Joyce granted the Petitioner political asylum, and the Petitioner's two kids, and husband, who were already in the U.s. received derivative asylum status.

25. Thereafter, the Petitioner applied for adjustment of status in late 1999, early 2000. However, due to a backlog, the application was never adjudicated.

(ii) Current Proceedings (2007)

26. On or about June 15, 2005, the Petitioner and her son were charged in connection with a four count

indictment charging conspiracy (18 U.S.C. §371), and three counts of wire fraud (18 U.S.C. §1343). See United States v. Hakan Yalincak, et al., Case No. 3:05-CR-00153-JBA. The Petitioner did not move for bail pending trial.

27. On or about July 13, 2006, the Petitioner pled guilty to conspiracy to commit wire fraud with the understanding that the sentencing court would calculate the appropriate sentence. See 05cr153, Doc. 81-82.

28. On or about August 17, 2006, Magistrate Judge Joan G. Margolis granted the Petitioner bail pending sentence pursuant to 18 U.S.C. §3143, upon a "clear and convncing" showing that the Petitioner did not pose a risk of flight or danger to the Community. By this point, the Petitioner had already served 14 months in pretrial detention. The Petitioner's family, and friends in the community, posted unsecured personal appearance bonds and the Petitioner was released on August 24, 2007. Further, the Petitioner, at that time, resided with a third-party custodian, Dr. Robert McKay, an American citizen, and a former owner of the Municipal Cafeteria accross the federal courthouse in Hartford, Connecticut. Dr. McKay has known the Petitioner and her family for over 10 years and is willing to, again, assist in securing bond for the Petitioner.

29. The Petitioner was sentenced on March 19, 2007, to a term of imprisonment of twenty-four (24) months,

3 years supervised release, and ordered to pay $2.25 million in Restitution. The Petitioner also received credit for 14 months spent in pretrial detention. The Court, Arterton, J., further found the Petitioner's role in the offense as between minor and minimal, and reduced the Petitioner's guideline leve by 3 points pursuant to U.S.S.G. §3B1.2. The Petitioner's final guideline calculation was a level 16 (6 base, 16 for forseeable loss, minus 3 for acceptance, and minus 3 for role). The Petitioner was ordered to self-surrender on April 24, 2007.

30. On April 24, 2007, the Petitioner self-surrendered to FCI Danbury Low, in Danbury, Connecticut and completed her sentence on November 9, 2007. Upon completion of her sentence, the Petioner was immediatley taken into custody by the Respondents.

31. Additionally, on December 26, 2007, the Court, Arterton J., issed an Order granting her, and her son's (i.e., codefendant's) joint Motion to Credit Defendants With Funds Recovered In Bankruptcy Proceedings (05cr111, Doc. 160, 159, 156, 147-148 (original not filed in 05cr153)).

32. The Petitioner, on or about July 27, 2007, was served with a Notice to Appear ("NTA") charging removability under Section 237(a)(2)(A)(iii) of the INA, namely, a conviction for an aggravated felony as defined in Section 101(a)(43)(U). (A copy of the NTA is attached hereto as **Exhibit B**.)

33. The Petitioner's removal proceedings before IJ Michael Straus, Hartford, Connecticut, began on or about September 27, 2007, with a master calendar hearing scheduled for November 27, 2007, and a merits hearing scheduled for January 16, 2008.

34. The Petitioner applied for three forms of relief: Waiver under Section 209(c) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. §1159(c); witholding of removal under Section 241(b)(3) of the INA, 8 U.S.C. §1231(b)(3); and under the Convention Against Torture ("CAT"), 8 C.F.R. §§1208.16-.18.

35. On January 16, 2008, the IJ Michael Straus denied the Petitioner all forms of requested relief and Ordered the Petitioner deported to Turkey.

(iii) Petitioner's BIA Appeal, Motion to Reconsider, Petition for Review, And Stay of Deportation

36. On February 14, 2008, the Petitioner filed a timely Notice of Appeal with the Board of Immigration Appeals ("BIA").

37. On April 24, 2008, the Petitioner submitted her BIA Appeal Brief. (A copy of the Petitioner's BIA Appeal Brief is attached hereto as **Exhibit C**.)

38. On May 22, 2008, the BIA issued an unpublished opinion affirming IJ Straus' denial and dismissing the Petitioner's appeal. (A copy of the BIA Decision is attached hereto as **Exhibit D**.)

39. On June 18, 2008, the Petitioner timely filed a Petition for Review With The Second Circuit Court of Appeals.

As of the date of this habeas, the Petition for Review is pending. (A copy of the PACER docket sheet printout is attached hereto as **Exhibit D**.)

40. On June 20, 2008, the Petitioner timely filed a Motion to Reconsider with the BIA. This motion is presently pending. (A copy of the Petitioner's Motion to Reconsider is attached hereto as **Exhibit E**.)

41. On or about July 11, 2008, the Petitioner filed a Motion to Stay her removal pending resolution of her Petition for Review, through her immigration counsel of Edwin T. Gania, Mark Jacob Thomas & Associates, with the local ICE office in Hartford, Connecticut. The Petitioner's motion was subsequently denied.

42. On or about July 14, 2008, the Petitioner also filed an Emergency Motion to Stay her Removal, with The Second Circuit Court of Appeals. The Petitioner's removal has been stayed, absent objection from Respondent Michael B. Mukasey.

43. At the time of filing of the Petitioner's instant Petition for A Writ of Habeas Corpus, the Petitioner has been in custody in excess of ten (10) months under operation of INA §236(c), 8 U.S.C. §1226(c).

44. The Petitioner is in ill health and amongst other things, suffers from insulin dependant diabetes, unstable angina, and heart diease. In addition, in October

2001, she suffered a stroke and between 2003 and 2007 suffered two miocardial infractions (i.e., heart attacks). (A copy of a letter addressed to Judge Arterton in the criminal cases is attached hereto as **Exhibit E.**) (A more recent history of the Petitioner's health is also described in her Sentencing Memorandum in 05cr153, Doc. 119). Additionally, in 2007, the Petitioner's health care physician also discovered that the Petitioner had two nodules on her lungs and a cyst on her liver. However, due to the criminal proceedings, and her subsequent detention by ICE, the Petitioner has been unable to obtain a biopsy, and has been hospitalized on numerous occassions while in custody due to fluid build up in her lungs.

45. The Petitioner has two family members she can reside with, her husband who is employed, and her daughter who likewise is employed and attends college, and in addition, Dr. Robert McKay, a U.S. citizen, who previously acted as third-party custodian is, again, willing to post bail on behalf of the Petitioner, or assist the Court in any way necessary.

46. Further, in light of the Petitioner's numerous health problems, and the inadequate level of medical care she is receiving at her place of incarceration, the Donald W. Wyatt Detention Facility ("Wyatt"), the Petitioner's health has steadily deteriorated and the Petitioner, since her detention at Wyatt, has spent more than ten (10) days

in an outside hospital, and was comatose on one such occassion due to the inadequate level of healthcare being provided at Wyatt. In addition, the treatment the Petitioner is receiving at the Wyatt has steadily worsened since her son, Hakan Yalincak, filed a Bivens lawsuit in the United States District Court for the District of Rhode Island aginst the operators of Wyatt. (See Hakan Yalincak v. Cornell Companies, Inc., et al., Case No. 1:08-CV-00057-S-JH, in connection with harm he suffered while he was held for 20 months in pretrial detention at Wyatt, before he received bail.)

47. The Petitioner's custody status will be reviewed for the first time on August 22, 2008.

48. The Petitioner has written letters, through counsel, her family, and sponsors, to obtain relief directly through the Respondents. The Petitioner has not, as of the date of this Petition, received any response.

49. Because the Petitioner's removal has been stayed by The Second Circuit Court of Appeals, the Petitioner has continued to be detained under INA §236(c), 8 U.S.C. §1226(c), and absent relief from this Court, the Petitioner will be subject to indefinite detention. (A copy of the Petitioner's Emergency Motion to Stay Removal, which was filed in the Court of Appeals, and which Respondent Michael B. Mukasey, through counsel, consented to, is attached hereto as **Exhibit F**.)

## CLAIMS FOR RELIEF

## COUNT ONE

## SUBSTANTIVE DUE PROCESS VIOLATION

50. The Petitioner hereby re-alleges and incorporates by reference paragraphs 1 through 49 above as if fully set forth herein.

51. The Petitioner's continued detention violates Petitioner's right to substantive due process through a deprivation of the core liberty interest in freedom from boidly restraint.

52. The Due Process Clause of the Fifth Amendment requires that the deprivation of Petitioner's liberty be narrowly tailored to serve a compelling government interest. While Respondents would have an interest in detaining Petitioner in order to effectuate removal, that interest does not justify the indefinite detention of the Petitioner, who is not significantly likely to be removed in the reasonable forseeable future due to the proceedings in The United States Court of Appeals. Significantly, the Respondents consented to a stay, and until resolution of that matter, the Respondents will be unable to remove the Petitioner. In Demore v. Kim, 538 U.S. at 513, 529, 531-32, the U.S. Supreme Court reconized "detention during deportation proceedings as a constitutionally valid aspect of the deportation process." Id. at 523. However, the Supreme Court specifically referred to statistics demonstrating the typically brief period that pre-final order removal proceedings

require and the attendant short periods of detention that are therefore typically imposed. Relying on statistics compiled by the Executive Office of Immigration Review, the Supreme Court noted that in 85% of cases in which aliens were detained under §236(c), removal proceedings were completed within an average of 47 days, with a median of 30 days. Id at 529, 123 S.Ct. 1708.

53. Similarly, In Zadvydas v. Davis, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court recognized that ICE may continue to detain aliens only for a period reasonably necessary to secure the alien's removal. The presumptively reasonable period during which ICE may detain an alien is only six months. Petitioner has already been detained in excess of six months and the Petitioner's removal is not significantly likely to occur in the reasonably foreseeable future.

54. Therefore, the Petitioner's continued detention violates her right to substantive due process through a deprivation of the core liberty interest in freedom from bodily restraint.

**COUNT TWO**

**PROCEDURAL DUE PROCESS VIOLATION**

55. The Petitioner hereby re-alleges and incorporates by reference paragraphs 1 through 54 above as if fully set forth herein.

56. Under the Due Process Clause of the Fifth Amendment, an alien is entitled to a timely and meaningful opportunity to demonstrate that she should not be detained. There is no adequate administrative mechanism in place for the Petitioner to obtain a decision from a neutral arbiter or appeal a custody decision by the Respondents. The custody review procedures for individuals, such as the Petitioner, are constitutionally insufficient both as written and as applied. A number of courts have identified a substantial bias within ICE toward the continued detention of aliens, raising the risk of an erroneous deprivation to unconstitutionally high levels. See e.g., Phan v. Reno, 56 F.Supp.2d 1149, 1157 (W.D. Wash. 1999)("INS does not meaningfully and impartially review the Petitioners' custody status."); St. John v. McElroy, 917 F.Supp. 243, 251 (S.D.N.Y. 1996)("Due to political and community pressure, INS, an executive agency, has every incentive to continue to detain aliens with aggravated felony convictions, even though they have served their sentences, on the suspicion that they may continue to pose a danger to the community."); see also Rivera v. Demore, No. C 99-3042 TEH, 1999 WL 521177, at *7 (N.D.Cal. Jul. 13, 1999)(procedural due process requires that alien release determination be made by impartial adjudicator due to agency bias).

57. As a result of the foregoing, the Petitioner's continued detention, without meaningful review by an impartial adjudicator of her custody status, violates her procedural due process rights.

**COUNT THREE**

**STATUTORY VIOLATION**

58. The Petitioner hereby re-alleges and incorporates by reference paragraphs 1 through 57 above as if fully set forth herein.

59. In the alternative, if Petitioner's continued detention under INA §236(c), 8 U.S.C. §1226(c) does not violate her rights as set forth above, and instead the Petitioner's custody by the Respondents is under operation of 8 U.S.C. §1231(a)(6), then, the Petitioner's continued detention by the Respondents violates 8 U.S.C. §1231(a)(6), as interpreted in Zadvydas v. Davis, 533 U.S. 678 (2001). Petitioner's ninety-day statutory removal period and six-month presumptively reasonable period for continued removal efforts both have passed. Respondents are unable to remove the Petitioner to Turkey because Respondent Michael B. Mukasey, through counsel, consented to a stay in connection with the Petitioner's pending Petition for Review in The Second Circuit Court of Appeals. Moreover, there is no time frame for a decision by the Second Circuit, and therefore, there is no significant likelihood of removal in the reasonably foreseeable future.

60. In Clark v. Martinez, 125 S.Ct. 716, 727 (2005), the Supreme Court held that the continued indefinite detention of someone like the Petitioner under such circumstances is unreasonable and not authorized by 8 U.S.C. §1231(a)(6).

61. Also, in Ly v. Hansen, 351 F.3d 263, 272 (6th Cir. 2003), the Sixth Circuit held in a case involving detention of a criminal alien under section 1226(c), that "apeals and petitions for relief are to be expected as a natural part of the process. An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him. Further, although an alien may be responsible for seeking relief, he is not responsible for the amount of time that such determinations may take." Id.

62. The Petitioner contends that her removal is not reasonably forseeable for two reasons. First, since a stay has been put in place, the Second Circuit may well reverse her removal order or remand her case for further administrative proceedings because her petition for review advances substantial, meritorious arguments that the IJ erred in ruling on her various applications for relief. Second, regardless of the likelihood of prevailing on her petition for review, her removal is not significantly likely to happen in the foreseeable future because there is no time frame for a decision by the Second Circuit. See Martinez v. Gonzales, 504 F.Supp.2d 887, 899 (C.D.Cal. Aug. 17, 2007); Nadarajah v. Gonzales, 443 F.3d 1069, 1081 (9th Cir. 2006).[2]

---

2. The Petitioner would also note the following: a stay of removal is not automatic; it is granted only if the petitioner shows either the probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in the petitioner's favor. See Andreiu v. Ashcroft,

63. As a result of the foregoing, the Petitioner's continued detention, whether under 8 U.S.C. §1231(a)(6), or 8 U.S.C. §1226(c), is unauthorized by statute.

**COUNT FOUR**

**EQUAL PROTECTION VIOLATION**

64. The Petitioner hereby re-alleges and incorporates by reference paragraphs 1 through 63 above as if fully set forth herein.

65. The Respondents continued detention of the Petitioner violates her rights under the Equal Protection clause where similarly situated aliens have been treated differently.

66. The custody review process as written and as applied by the Respondents is wholly insufficient and produces arbitrary and capricious results that vary from one alien to another and produce an environment where similarly situated aliens are treated differently.

67. The Respondents do not provide a meaningful and impartial review of the Petitioner's custody status, and absent relief from this Court, it is unlikely that the Petitioner will ever receive a meaningful and impartial review of her custody status that comports with her substantial and procedural due process rights as guaranteed by the United States Constitution. See Phan, supra at 1157; St. John, supra at 251; Rivera, supra at 1999 WL 521177, *7.

---

253 F.3d 477, 484 (9th Cir. 2001)(en banc). In the instant case, the Respondent Michael B. Mukasey consented to a stay.

## PRAYERS FOR RELIEF

**WHEREFORE,** Petitioner prays that this Court grant the following relief:

1. Assume jurisdiction over this matter;

2. Grant Petitioner a writ of habeas corpus directing the Respondents to immediately release Petitioner from custody, or in the alternative, immediately afford her a bond hearing before an Immigration Judge;

3. Alternatively, grant Petitioner a writ of habeas corpus, and exercise its habeas jurisdiction to afford the Petitioner a bond hearing;

4. Enter prelimintary and permanent injunctive relief enjoining Respondents from further unlawful detention of Petitioner;

5. Award Petitioner attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 5 U.S.C. §504 and 28 U.S.C. §2412, and on any other basis justified under law; and

6. Grant any other and further relief that this Court deems just and proper.

I affirm, under penalty of perjury, that the foregoing is true to the best of my knowledge and belief.

Date: 8/6/2008

Respectfully submitted,
Petitioner Pro Se,

A. Yalincak

Ayfer Yalincak Pro Se
A 73-393-720
Donald W. Wyatt Facility
950 High St.
Central Falls, RI 02863

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
CHICAGO, ILLINOIS

File: A73 - 393 - 720 Date: May 28, 1997

In the Matter of )
) IN DEPORTATION PROCEEDINGS
Ayfer Yalincak, )
)
Respondent. )

CHARGE: Section 241(a)(2)(A)(i) of the INA, Conviction of a crime involving moral turpitude within five years;

Section 241(a)(1)(B) of the INA, remained longer than permitted;

Section 241(a)(2)(a)(iii) of the INA, convicted of an aggravated felony.

APPLICATION: Motion to Terminate, Change of Venue

ON BEHALF OF THE RESPONDENT:
Edwin T. Gania, Esq.
11 S. LaSalle St.
Chicago, Il. 60603

ON BEHALF OF THE SERVICE:
Mary Giovagnoli
Asst. District Counsel, INS
10 W. Jackson
Chicago, Il. 60604

ORDER OF THE IMMIGRATION JUDGE

This matter appears before me on respondent's motion contesting deportability and for change of venue, the Immigration Service (the "Service") having been duly notified and having filed its response in opposition,

IT IS HEREBY ORDERED: that the respondent is deportable as charged for having remained longer than permitted. The government has failed to sustain deportability on the remaining two charges and that venue be changed from Chicago to Hartford, Connecticut for the following reasons.

The respondent is a female, native and citizen of Turkey who entered the United States as a nonimmigrant visitor on about May 4, 1992 with permission to remain for six months. On September 22, 1995, the respondent was convicted of the offense of Practicing Medicine without a License. This offense constitutes a class C felony in the state of Indiana for which the respondent was sentenced to confinement for a period of eight years. (*See* Exhibit 3). Deportation proceedings were commenced through the issuance of an Order to Show Cause on September 12, 1996, charging

EXHIBIT A

A73-393-720

respondent with deportability under the above-captioned sections of the Immigration & Nationality Act ("the Act"). (See Exhibits 1 & 2). At her deportation hearing, the respondent conceded deportability as one who had remained longer than permitted, but denied deportability as to the remaining charges of having been convicted of a crime involving moral turpitude and of an aggravated felony as defined by the Act.

Practicing medicine without a license is not a crime involving moral turpitude

It is a well established principle that the inherent nature of the crime as defined by statute and interpreted by the courts, and as limited and described by the record of conviction, determines whether the offense is one involving moral turpitude. Okabe v. INS, 671 F.2d 863 (5th Cir. 1982); United States v. Neely, 208 F.2d 337 (7th Cir. 1953); Matter of Baker, 15 I&N Dec. 50 (BIA 1974); Matter of H-, 7 I&N Dec. 616 (BIA 1957). The statute under which the conviction occurred controls. If the statute defines a crime in which turpitude necessarily inheres, then the conviction is for a crime involving moral turpitude for the purposes of the deportation statute. United States ex rel. Guarino v. Uhl, 107 F.2d 399 (2d Cir. 1939). The term "moral turpitude" has been held to encompass an act which is per se morally reprehensible and intrinsically wrong or malum in se. Matter of Flores, 17 I&N Dec. 225 (BIA 1980).

The statute involved in this case does not necessarily define a crime in which turpitude inheres. Unlawful Practice is defined as follows in Indiana: "It is unlawful for any person to practice medicine or osteopathic medicine in this state without holding a license or permit to do so as provided in this article." INDIANA CODE § 25-22.5-8-1.1. This statute criminalizes the practice of medicine or osteopathic medicine without holding a license or permit regardless of the person's motive. There is nothing which is per se morally reprehensible with this act. The Board has held that similar crimes did not constitute crimes involving moral turpitude without proof of a wrongful or fraudulent intent. A conviction for possession of an altered immigration document with knowledge that it was altered, but without proof of any intent to use it unlawfully, was not a conviction for a crime involving moral turpitude in Matter of Serna, 20 I&N Dec. 579 (BIA 1992). The Board has also held that the knowing issuance of bad checks without proof of an intent to defraud is not a crime involving moral turpitude. See Matter of Balao, 20 I&N Dec. 440 (BIA 1992); Matter of Zangwill, 18 I&N Dec. 22 (BIA 1981), rev'd on other grounds, Matter of Ozkok, 19 I&N Dec. 546 (BIA 1988); Matter of Colbourne, 13 I&N Dec. 319 (BIA 1969); Matter of Stasinski, 11 I&N Dec. 202 (BIA 1965).

Based on a plain reading of the statute I find that no element of fraud is required for a conviction under Indiana law. Inasmuch as this crime neither inherently nor as defined involves moral turpitude, I find that the respondent was not convicted of a crime involving moral turpitude for immigration purposes.

A73-393-720

Respondent has not been convicted of an aggravated felony under the Act.

The Service alleges that respondent's conviction for practicing medicine without a license constitutes an aggravated felony under section 101(a)(43)(M)(i) of the Act as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). Section 101(a)(43)(M)(i) of the Act defines an aggravated felony as "the commission of an offense involving fraud or deceit in which the loss to the victim or victims exceeds $10,000. Id.

Determination of whether the offense is one which involves fraud or deceit must begin by analyzing the statute with two questions in mind: (1) does the crime involve fraud or deceit and (2) was there a loss to victims of at least $10,000? In the state of Indiana it is unlawful for any person to practice medicine or osteopathic medicine without holding a license or permit as provided by the statute. The statute does not require any intent to commit fraud or to deceive any individual in order to be in violation of Indiana law. As written, the Indiana statute may be violated by an individual who is highly competent, but who simply forgot to pay the appropriate fee. This court does not intend to imply that respondent's conduct in the instant case involved simple neglect. However, this court is unwilling to ignore the statute and look solely to respondent's conduct which resulted in the violation of law. Therefore, the practice of medicine without a license does not constitute an aggravated felony under the Act. Consequently, it is unnecessary to reach the question of whether losses to the victim exceeded $10,000 dollars.

Respondent's Motion For Change of Venue.

Respondent requests that venue be changed to the Immigration Court with jurisdiction over Bristol, Connecticut to enable her to properly present her request for asylum. The respondent has submitted an application for asylum in connection with her request for a change of venue. Currently, the respondent is being held in a local county jail in Wisconsin while her hearing is held in Chicago. In support of her motion, resondent argues that she was residing in Bristol, Connecticut prior to her extradition to Indiana on the charges for which she was incarcerated by the state of Indiana. She has a husband and two children who still reside in Bristol. She further argues that it is not possible for her family to visit her in Indiana or Wisconsin given the distance involved and her husband's poor health. In addition, respondent has several witnesses who will testify at her asylum hearing who reside close to Bristol.

The Service responds that there are countervailing interests which outweigh the reasons stated by respondent for changing venue. First, the immigration judge has not ruled on one ground of deportability. Second, transferring venue imposes a double cost on the government, because the Service would incur the cost of transferrring respondent to Connecticut and the case would be further delayed pending the transfer. The Service also argues that it anticipates calling witnesses, all of whom are located in Indiana, to support its opposition to asylum as a matter of discretion.

U. S. Department of Justice
Immigration and Naturalization Service

**Notice to Appear**

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID : 264227428
REG# 15680-014

File No: A073 393 720
Event No: HAR0707000060

In the Matter of:

Ayfer YALINCAK

Respondent: currently residing at:
FEDERAL CORRECTIONAL INSTITUTION DANBURY 33 1/2 PEMBROKE STATION , DANBURY CONNECTICUT 06811

(Number, street, city and ZIP code) (Area code and phone number)

☐ 1. You are an arriving alien.

☐ 2. You are an alien present in the United States who has not been admitted or paroled.

☒ 3. You have been admitted to the United States, but are removable for the reasons stated below.

The Service alleges that you:

1. You are not a citizen or national of the United States;
2. You are a native of TURKEY and a citizen of TURKEY;
3. You were admitted to the United States at LOS ANGELES, CALIFORNIA on or about May 4, 1992 as a B2 non-immigant visitor;
4. You were, on April 4, 1998, granted Asylum by the Immigration Judge in Hartford, CT;
5. You were, on March 19, 2007, convicted in the United States District Court, District of Connecticut, for the offense of Conspiracy, in violation of Title 18 United States Code, Section 371;
6. This offense involved fraud or deceit in which the loss to the victim or victims exceeds ten thousand dollars ($10,000).

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

See Continuation Page Made a Part Hereof

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to: ☐ 8CFR 208.30(f)(2) ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

A. A. Ribicoff Federal Building 450 Main Street Room 509 Hartford CONNECTICUT US

(Complete Address of Immigration Court, Including Room Number, if any)

on a date to be set at a time to be set to show why you should not be removed from the United States based on the
(Date) (Time)

charges(s) set forth above.

GEORGE SULLIVAN ASSISTANT FIELD OFFICE DIRECTOR

(Signature and Title of Issuing Officer)

Date: July 23, 2007 HARTFORD, CT

(City and State)

See reverse for important information

**U.S. Department of Justice**
Immigration and Naturalization Service

Continuation Page for Form I862

| Alien's Name | File Number | Date |
| --- | --- | --- |
| Ayfer YALINCAK | A073 393 720<br>Event No: HAR0707000060 | |

ON THE BASIS OF THE FOREGOING, IT IS CHARGED THAT YOU ARE SUBJECT TO REMOVAL FROM THE UNITED STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(M) of the Act, a law relating to an offense that (i) involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or (ii) is described in The Internal Revenue Code of 1986, Section 7201 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000.

Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (Act), as amended, in that, at any time after admission, you have been convicted of an aggravated felony as defined in section 101(a)(43)(U) of the Act, a law relating to an attempt or conspiracy to commit an offense described in section 101(a)(43) of the Act.

Signature GEORGE SULLIVAN

Title ASSISTANT FIELD OFFICE DIRECTOR

3 of 3 Pages

### Notice to Respondent

**Warning: Any statement you make may be used against you in removal proceedings.**

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 3.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents, which you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear and that you are inadmissible or removable on the charges contained in the Notice to Appear. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge.

You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of departure voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to one of the offices listed in 8 CFR 241.16(a). Specific addresses on locations for surrender can be obtained from your local INS office or over the internet at http://www.ins.gov/graphics/surrender.htm. You must surrender within 30 days from the date the order becomes administratively final, unless you obtain an order from a Federal court, immigration court, or the Board of Immigration Appeals staying execution of the removal order. Immigration regulations at 8 CFR 241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Act.

### Request for Prompt Hearing

To expedite a determination in my case, I request an immediate hearing. I waive my right to a 10-day period prior to appearing before an immigration judge.

Before:

_______________________ (Signature of Respondent)

Date:

_______________________ (Signature and Title of INS Officer)

### Certificate of Service

This Notice To Appear was served on the respondent by me on July 22, 2007, in the following manner and in compliance with section 239(a)(1)(F) of the Act.

[x] in person [ ] by certified mail, returned receipt requested [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[x] Attached is a list of organization and attorneys which provide free legal services

The alien was provided oral notice in the ENGLISH language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_______________________ (Signature of Respondent if Personally Served)

DAVID S. HAMILTON IMMIGRATION ENFORCEMENT AGENT (Signature and Title of officer)

ATTACHMENT TO NOTICE OF APPEAL

Ayfer Yalincak
A73 393 720

## Issues on Appeal

1. The immigration judge applied an incorrect legal standard and improperly denied respondent's application for an INA section 209(c) waiver where respondent demonstrated by a preponderance of the evidence that her humanitarian and/or family unity considerations outweighed her specific criminal acts which constituted only a minor part of the overall conspiracy as set forth by respondent's uncontroverted testimony and by the indictment itself. Instead, the immigration judge reached an improper and highly prejudicial finding as to the nature of respondent's criminal acts.

2. The immigration judge improperly pretermitted respondent's application for withholding of removal by concluding that respondent's conviction was for a particularly serious crime without proper consideration of the criteria set forth in Matter of Frentescu, 18 I&N Dec. 244 (BIA 1982). Steinhouse v. Ashcroft, 247 F.Supp.2d 201 (D. Conn. 2003). This finding was highly prejudicial to respondent as she presented credible, detailed and uncontroverted evidence as to the likelihood of persecution she would face based upon her Kurdish ethnicity.

3. Respondent's due process rights were violated where counsel was not permitted the opportunity to make closing arguments or any opportunity to directly address any legal or factual issues, particularly the legal standards to be applied with regard to her applications for a 209(c) waiver and withholding of removal. Gilaj v. Gonzales, 408 F.3d 275 (6th Cir. 2005).

4. The immigration judge improperly relitigated respondent's 1998 grant of asylum and, in doing so, employed a brief, arbitrary and superficial analysis.

Edwin T. Gania
Mark Jacob Thomas & Associates
11 S. LaSalle Street
Suite 2800
Chicago, IL 60603
(312) 236-3163

DETAINED

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
FALLS CHURCH, VIRGINIA

| | | |
|---|---|---|
| In the Matter of: | ) | |
| YALINCAK, Ayfer | ) | File No.: A73 393 720 |
| In removal proceedings<br>Hartford, Connecticut | ) | |

**BRIEF OF RESPONDENT**

U.S. DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
FALLS CHURCH, VIRGINIA

| | | |
|---|---|---|
| In the Matter of: | ) | |
| YALINCAK, Ayfer | ) | File No.: A73 393 720 |
| In removal proceedings<br>Hartford, Connecticut | ) | |

BRIEF OF RESPONDENT

Procedural History

Respondent is a married female, native and citizen of Turkey, who was admitted to the United States on or about May 4, 1992 as a nonimmigrant visitor.

Prior Proceedings

On September 22, 1995, respondent was convicted of practicing medicine without a license in the state of Indiana for which she was sentenced to two years imprisonment and execution suspended after two years. I.J. at 3. On September 12, 1996, respondent was placed into deportation proceedings with the issuance of an Order to Show Cause. On May 28, 1997, Immigration Judge ("IJ") Carlos Cuevas in Chicago, Illinois, issued an order finding that the respondent's Indiana conviction did not qualify as a crime involving moral turpitude under Section 241(a)(2)(A)(i) of the Immigration and Nationality Act ("INA"), nor as an aggravated felony under INA Section 241(a)(2)(a)(iii).

Subsequently, after a change of venue to Hartford, Connecticut, respondent was granted asylum on April 18, 1998, by IJ William Joyce based upon a finding of both past persecution and a well-founded fear of future persecution.

Current Proceedings

On March 19, 2007, respondent was sentenced in connection with her July 13, 2006, plea of guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. Respondent was sentenced to a term of imprisonment of 24 months and ordered to pay restitution in the amount of $2,250,000. See Exhibit 3.

On July 23, 2007, the Department of Homeland Security (DHS) issued a Notice to Appear charging respondent as being removable from the United States under § 237(a)(2)(a)(iii) of the Act as an aggravated felon, as defined in § 101(a)(43)(M) of the Act, convicted of an offense that involves fraud or deceit in which the loss to the victim exceeds $10,000. (Exhibit 1). In support of the allegations on the Notice to Appear, DHS submitted a certified copy of the conviction record (Exhibit 3) and the indictment (Exhibit 4).

Respondent sought relief from removal in the form of adjustment of status under Section 209 of the INA, withholding of removal, and withholding of removal under Article 3 of the Convention Against Torture ("CAT"). On January 16, 2008, at the conclusion of the respondent's removal hearing, the Immigration Judge ("IJ") denied all of respondent's applications for relief and ordered respondent removed to Turkey. The IJ held that the respondent's March 19, 2007 conviction constituted a particularly serious crime. Further, IJ Straus denied the respondent's waiver of inadmissability under Section 209(b) of the Act and held that the respondent did not merit a favorable exercise of discretion. Respondent subsequently filed this timely appeal.

Factual Background

In light of the fact that IJ Joyce had previously found the respondent to have been subject to persecution and granted the respondent asylum, IJ Straus deemed her previous affidavit as her direct testimony. Tr. at 36. The respondent's affidavit, attached to her application (Exhibit 5), states in detail the incidents which occurred to her in Turkey. At her merits hearing, respondent testified that, in 2004, her then 20 year old son, Hakan Yalincak, a student at New York University, attempted to start a hedge fund along with several associates, Matthew Thomas, Michael Legamaro and Mary Sachitano, each of whom had extensive experience in the finance industry. Tr. at 44-47. Her son was an excellent student, earning high grades and graduating early from high school. Tr. at 48. Her son and his associates opened a trading account and went about raising funds from wealthy individuals experienced in the financial industry. Tr. at 49-52. The group was successful in raising approximately $7.5 million. At some point, the hedge fund ceased to operate as a legitimate fund. Respondent herself received a small amount of money from the fund as a payment for services. Tr. at 53-54.

Respondent testified that she played a minor role in the conspiracy; her wrongdoing was that she did not correct certain statements made by her son in her presence. She had no other involvement in the conspiracy. Tr. at 54-58, 72-74. She testified that she has paid back approximately $1.5 million of the restitution she was ordered to pay pursuant to her plea agreement. Tr. at 58-59.

She testified that if she were ordered to return to Turkey her husband and children would not accompany her. She would have problems in Turkey on account of her past history of treating PKK members and also for being granted asylum in the U.S. She will have trouble gaining employment in Turkey and her children would have trouble adjusting since they do not speak Turkish. Tr. at 59-61. She would be prevented from practicing Kurdish traditions.

Respondent testified that she has numerous health issues, such as coronary problems and diabetes, for which she takes medication. Tr. at 63-67. Dr. Michael Gunter, professor of political science at Tennessee Tech University, testified as an expert witness as to country conditions facing Kurds in Turkey. He stated that

Kurds still have serious problems in southeastern Turkey and while there have been reforms in Turkey, there remains an ongoing conflict against the PKK, a rebel Kurdish group, and its supporters. Tr. at 92-93. There are laws that support the persecution of Kurds. Article 301 of the Turkish penal code makes it an illegal act to "denigrate Turkishness". Other provisions of the Turkish penal code may create difficulty for a person returning to Turkey after being granted asylum. Tr. at 94-95. The status of women in Turkey is significantly lower than in the west and may create adjustment problems for respondent's daughter. Tr. at 95-98. Economic conditions are much lower in Turkey than in the U.S. Tr. at 98. He concluded that respondent would likely face harm if returned to Turkey. Tr. at 99-100, 103.

Dr. Robert McKay testified to his knowledge of respondent's character and her role in the criminal conspiracy. He has known respondent since 1999. Respondent resided with Dr. McKay and his family for 8 months in 2006 as part of her bail conditions in federal court. He described her as honest person that could be trusted around the house. Tr. at 114-115. He described her various medical ailments, such as her diabetic and heart condition. Tr. at 116. He had a conversation with the Turkish ambassador who was aware of Ayfer Yalincak and wished to obtain further information about her. Tr. at 122-123.

## Issues on Appeal

I. Whether the Immigration Judge applied an incorrect legal standard and improperly denied respondent's application for an INA section 209(c) waiver where respondent demonstrated by a preponderance of the evidence that her humanitarian and/or family unity considerations outweighed her specific criminal acts which constituted only a minimal part of the overall conspiracy.

II. Whether The IJ applied an improper legal standard and factual analysis in determining that respondent's conviction was for a particularly serious crime thereby pretermitting her application for withholding of removal.

III. Whether the decision of the IJ denying withholding of removal and/or withholding of removal under article 3 of the Convention Against Torture is erroneous in viewing the record as a whole.

IV. Whether the respondent was denied her due process rights where counsel was not permitted the opportunity to make closing arguments or any meaningful opportunity to directly address any legal or factual issues, particularly the legal standards to be applied with regard to the respondent's various applications for relief.

## Argument

**I. The Immigration Judge applied an incorrect legal standard and improperly denied respondent's application for an INA section 209(c) waiver where respondent demonstrated by a preponderance of the evidence that her humanitarian and/or family unity considerations outweighed her specific criminal acts which constituted only a minor part of the overall conspiracy**

A. The IJ applied an incorrect legal standard to respondent's application for an INA section 209(b) waiver and reached an improper and highly prejudicial finding

i. Legal Standard

An asylee who has been convicted of an aggravated felony may seek adjustment status upon the grant of waiver on humanitarian grounds pursuant to 8 C.F.R. §1209.2(c) under Section 209 (b) or (c) of the Act. Matter of K-A-, Interim Decision 3499 (BIA 2004). The Board's precedent decision, Matter of Jean, 23 I&N Dec. 373 (A.G. 2002), sets forth the legal standard under Section 209(b) and (c) of the INA for discretionary relief. Specifically, in Matter of Jean, the A.G. held, "[a]dministrative evaluations of

requests for waivers of inadmissibility under INA section 209(c)... must consider the nature of the criminal offense that rendered an alien inadmissible in the first place." Id. The analysis by the IJ should, therefore, be confined to balancing the nature of the criminal offense that renders an alien inadmissible against the factors enumerated in section 209(d), "humanitarian reasons, to assure family unity, or when it is otherwise in the public interest." Id.

Further, in discussing the balancing of favorable and adverse factors, the Board has stated that "[t]he danger of persecution will outweigh all but the most egregious adverse factors." Matter of Chen, 20 I&N Dec. 16, 19 (BIA 1989). Moreover, "as with any case involving the exercise of discretion, all other factors ... should be considered ... with recognition of the special considerations present in asylum cases." Id.

In addition, the actual experience of past persecution should other favorable considerations include "general humanitarian reasons... such as his or her age, health or family ties." Matter of H-, 21 I&N Dec. 337, 347-48 (BIA 1996).

Moreover, when such a review is undertaken, the failure to balance, by itself, justifies a remand for a proper balancing of the equities. See Kalubi v. Ashcroft, 364 F.3d 1134, 1140-41 (9th Cir. 2004) (remanding a discretionary denial of asylum where an IJ failed to consider the alien's past persecution and separation from his spouse); Castro-O'Ryan v. INS, 847 F.2d 1307, 1314 (9th Cir. 2004) (remanding an agency denial of asylum to a criminal alien where the agency failed to take into account countervailing equities); Shahandeh-Pey v. INS, 831 F.2d 1384, 1387-89 (vacating and remanding where the BIA failed to consider possible evidence of the petitioner's family ties, employment history, good character, property, and duration of residence in the United States, which might have outweighed his several prior criminal convictions.); see also Casem v. INS, 8 F.3d 700, 703 (9th Cir. 1993) (noting the special regard for keeping families intact by Congress).

ii. 1995 Indiana conviction for licensing violation

At the outset, the IJ erred by improperly weighing heavily the respondent's 1995 licensing violation in the balancing test discussed in Matter of Jean. Further, it was acknowledged by the Court that she was not rendered inadmissible by the 1995 conviction. Tr. 187-88. Moreover, the IJ engaged in a highly prejudicial and legally inaccurate analysis as to the nature of the respondent's criminal conviction and ignored the significant hardships that the respondent and her family would face. The Court also entered into an inaccurate and prejudicial analysis of the respondent's purported criminal history. I.J. at 15-16.

The IJ's analysis of the respondent's 1995 licensing violation ignored IJ Cuevas' May 28, 1997, order that the respondent's 1995 conviction itself was merely a licensing violation. Nor did this conviction constitute a crime involving moral turpitude nor an aggravated felony. The IJ further based his finding regarding the 1995 conviction as involving fraud because he found, "I mean, they could have charged her with fraud." Tr. at 178. The respondent never pleaded guilty to the investigator's affidavit, which IJ Straus so heavily relied upon. Tr. at 177. As the record clearly reflected, she pled guilty to simply a licensing violation.

However, the IJ evidently took as true extensive portions of an Indiana State investigator's "Affidavit for Probable Cause" despite that respondent did not plead guilty to the facts contained in this affidavit for probable cause and they are not even included in the charges that were ultimately brought against the respondent in 1995, or included in the Indiana plea agreement. Further, the Indiana plea agreement with the State of Indiana indicates that she pled guilty to "Unlawful Medical Practice" in violation of Indiana Code § 25-22.5-8-1.1. Moreover, as IJ Cuevas in Chicago, Illinois noted in his decision, "[t]he statute under which the conviction occurred controls ... Based on a plain reading of the statute I find that no element of fraud is required for a conviction under Indiana law... [and] The statute does not require any intent to commit fraud or to deceive any individual in order to be in violation of Indiana law."

Moreover, the IJ agreed during the hearing that under the Matter of Jean standard, in exercising his discretion he was only supposed to consider the conviction which

rendered the respondent inadmissible -- not the 1995 licensing violation. Tr. at 178. Yet, in his decision, he clearly states that "the Court must balance the respondent's criminal conduct against equities and hardships." I.J. at 15-16. In summarizing the nature of respondent's criminal conduct, the IJ clearly states respondent's first conviction and his assumption as to its serious nature.

Therefore, the IJ applied the wrong legal standard altogether by weighing respondent's humanitarian considerations against the 1995 licensing violation.

iii. 2007 conviction for conspiracy

In addition, the IJ failed to consider the fact that the respondent had only a minor role in the conspiracy to which she pled guilty and instead wrongly attributed the entire conspiracy to her.

Initially, it must be noted that the IJ was seemingly unfamiliar with interpreting a federal criminal statute or federal sentencing procedures. See Michel v. INS, 206 F.3d 253, 262 (2d Cir.2000) ("courts owe no [Chevron] deference to an agency's interpretation of state or federal criminal laws."). For example, at the September 27, 2007 hearing, IJ Straus demonstrated his unfamiliarity with federal criminal stating that "a conspiracy is a conspiracy". Tr. at 5.

In fact, in a conspiracy under 18 U.S.C. § 371, there are no affirmative steps or actions -- or overt acts -- necessary for a conviction of a co-conspirator to occur. It only requires that one of the conspirators commit an overt act. In this case, such conduct was attributable entirely to the son. United States v. Parekh, 926 F.2d 402 (5th Cir. 1991) (describing 18 U.S.C. § 371).

In addition, there are, as a matter of law, degrees in a conspiracy. Sentencing in federal court is governed by the United States Sentencing Guidelines ("U.S.S.G."). and the respondent at sentencing received a three level downward adjustment for having played between a minimal and minor role in the conspiracy pursuant to U.S.S.G. § 351.2. Further, under United States v. Studley, 47 F.3d 569, 576 (2d Cir. 1995), the sentencing court was required to make a particularized finding of the scope of the respondent's participation in the fraudulent scheme. The sentencing court, as reflected in the

sentencing transcript, as well as the sentence itself, in fact, did exactly that, and found that the respondent played between a minimal and minor role. Moreover, the IJ relied on the "restitution in the amount of $2,250,000." I.J. at 12. However, again, the sentencing court was mandated to order restitution pursuant to 18 U.S.C. § 3663, and the sentencing court, at the respondent's plea allocution and sentencing hearing, explicitly found that the respondent did not receive such amounts of money and the ultimate benefit was only several thousand dollars.

Therefore, the IJ's conclusion that, "as a conspirator, she is liable for any actions of co-conspirators" (I.J. at 11) was contrary to law.

Moreover, counsel offered to submit the pre-sentence report and the relevant portions of the respondent's sentencing transcript. Tr. at 6, 186. In fact, the respondent did not plead guilty to the entire indictment, but rather to one count of the indictment, with the stipulation that the sentencing Court would determine her criminal culpability, her role in the offense and sentence to be imposed. Pursuant to her plea agreement, respondent submitted a Petition to Enter A Plea of Guilty pursuant to Rules 10 and 11 of the Federal Rules of Criminal Procedure. The statement of facts attached to the said petition was accepted by the Court and by the Government as a result of the Respondent's plea allocution on July 13, 2006, which provided the factual basis for her guilty plea. The United States Sentencing Guidelines govern sentencing of a defendant in the underlying offense. It is apparent that the IJ was not aware that there are degrees of involvement in a conspiracy.

Further, the IJ misinterpreted the meaning of count one of the federal indictment to which respondent pled pursuant to a plea agreement. As the respondent and her son were co-defendants in a conspiracy, count one makes repeated reference in summary fashion to acts both persons as a single. Paragraph 8, entitled "Overt Acts", clarifies specific acts taken by each participant. Of the 18 overt acts listed, only 6 refer to respondent. Of these 6 acts, two acts (paragraphs d, k) refer to actions taken solely by her son in submitting false bank statements to the victims using an old account titled in her name. The indictment does not state whether these actions were taken with respondent's knowledge or participation. Three of the remaining four acts (paragraphs a,i,j) relate merely to three statements made by respondent in exaggerating her wealth. The final act

(paragraph r) relates to a promissory note executed by respondent which she intended to honor. Tr. at 88-89. In fact, respondent has made restitution of approximately $1.5 million. Tr. at 58-59. Thus, the indictment reflects merely 3 insignificant events as against years of extensive activity by the several participants including her son. Nonetheless, the IJ injected his own conjecture and speculation on the respondent's conspiracy conviction and made inaccurate findings as to her conduct in the conspiracy and ignored the facts established through the respondent's testimony as to her minimal role.

In addition, the IJ also looked at the wrong criminal statute: "The record reflects that respondent was convicted of ... wire fraud in violation of 18 U.S.C. § 1343." I.J. at 10-11. Respondent entered a guilty plea to a charge of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371. There are significant differences in penalties between a conviction for conspiracy in violation of 18 U.S.C. § 371, and a conviction for wire fraud, in violation of 18 U.S.C. §1343. The offense of conspiracy carries a maximum term of imprisonment of 5 years, mandatory supervised release (i.e., probation) of 3 years, and a fine of up to $250,000. The offense of wire fraud, in violation of 18 U.S.C. § 1343, by comparison, carries a maximum term of imprisonment of 20 years, mandatory supervised release (i.e, probation) of 3 years, and a fine of up to $1,000,000. Since the Government, at the respondent's sentencing voluntarily dismissed counts two through four (the "wire fraud counts"), the IJ's findings were clearly erroneous and failed to properly interpret the respondent's criminal conviction. See Michel v. INS, 206 F.3d 253, 262 (2d Cir. 2000).

Accordingly, the IJ Straus made improper and highly prejudicial findings as to the nature of the criminal offense which has rendered the respondent inadmissible, and failed to properly take the actual "nature of the criminal offense" into consideration as required under Matter of Jean. And, the IJ erred in weighing the respondent's 1995 licensing violation in the balancing test required under Matter of Jean.

He states that "the Court must therefore balance the equities against the adverse factors." I.J. at 17. However, the equities are to be weighed against only certain criminal acts and not against all possible adverse factors. This formulation changes the analysis significantly to the prejudice of respondent. Nor did the IJ separately consider each of

the 3 sets of factors. By virtue of the above errors, the IJ made an incorrect legal analysis which must be overturned.

B. The IJ erroneously concluded that respondent's humanitarian, family unity and/or public interest considerations clearly outweighed her specific criminal acts rendering her inadmissible

Under Section 209(c) of the INA, Congress has authorized the Attorney General to waive an alien's inadmissibility, "for humanitarian reasons, to assure family unity, or when it is otherwise in the public interest."

i. Humanitarian considerations

The IJ found that the respondent "has apparently some serious and significant medical issues [.]" (I.J. at 16), and concluded that the "respondent has significant equities in this country." I.J. at 17.

Respondent's medical condition is serious. A letter dated January 24, 2007 in Exhibit 5, from one her treating physicians noted, amongst other things, two heart attacks, nodules on her lung, a liver lesion, diabetes, heart disease, and numerous other concerns.

Also, as noted in the uncontroverted testimony of the respondent, her husband, and the respondent's character witness, Dr. Robert McKay, it is unlikely that either the respondent or her daughter could get proper and adequate medical treatment if deported to Turkey.

Further, under Matter of H-, 21 I&N Dec. 337, 347-48 (BIA 1996), Matter of Chen, 20 I&N Dec. 20 I&N Dec. 16, 19 (BIA 1989), respondent's past stroke, two heart attacks, heart disease, lung and liver problems, weighed heavily in favor of the waiver and the IJ abused his discretion. See also Kalubi v. Ashcroft, 364 F.3d 1134, 1140-41 (9th Cir. 2004); Castro-O'Ryan v. INS, 847 F.2d 1307, 1314 (9th Cir. 1988); and Shahandeh-Pey v. INS, 831 F.2d 1384, 1387-89 (7th Cir. 1987).

ii. Family unity considerations

The IJ did find significant factors weighing in favor of the waiver to assure family unit. The IJ stated:

"Balanced against that is the fact that the respondent has a son, a daughter, and a husband who are in the United States. But interestingly enough, their status hinges on whether she is granted adjustment of status under Section 209. They are apparently currently just asylees based on the fact that she was granted asylum in 1998. The Court would note that there would be significant hardships to the respondent." I.J. at 16.

In essence, in one fell swoop, the IJ ignored these significant equities and had no care about splitting up the respondent's family into many pieces. The respondent's family has lived in this country for the past sixteen years -- a lifetime for the respondent's children, and now, as a result, face the choice of either never seeing the respondent again, or seeking relief in this country.

As Congress has noted, family unity is the most important factor. See Casem v. INS, 8 F.3d 700, 703 (9th Cir. 1993) (noting the special regard that Congress has for keeping families intact). Moreover, the grant of this waiver was crucial for purposes of family unity. Tr. at 174-75. However, the IJ was unaware of what weight family unity should receive in its balancing analysis, "it is quite unclear how that affects the Court's analysis because she does not have status in the United States except as an asylee. But in any event, the Court does find that the respondent has significant equities in this country." I.J. at 17.

Whereas in the case of withholding of removal, the respondent's two children and husband would still face deportation, and the family would still be terminated, and be broken apart, if the IJ had granted the section 209 waiver, that would not be the case. In such instances, Court's have strongly favored this grant of discretionary relief over withholding of removal. See Huang v. INS, 436 F.3d 89, 101 (2d Cir. 2006) (discussing the discretionary denial of asylum and granting of withholding of removal).
For example, the federal regulation mandating reconsideration of discretionary denials of asylum explicitly recognizes the undesirability of family divisions attendant to a discretionary denial of asylum, and provide an added tier of protection in such

circumstances. See 8 C.F.R. § 1208.16(e) (reconsideration of discretionary grant of asylum is required because such decisions thereby effectively preclude admission of the applicant's spouse or minor children following to join him or her).

Accordingly, given the grave and unmistakable damage that would be inflicted upon this family were the respondent to be deported, the equities strongly favored the granting of the waiver on family unity and humanitarian grounds.

iii. Public interest factors

Remarkably, the IJ ignored a crucial evidentiary document contained within the record of proceedings. One of the investors in the hedge fund conspiracy, Louise Totillo, submitted a detailed affidavit to the sentencing court on behalf of the respondent and her son urging the sentencing court to downwardly depart and stating that she supports a wavier for immigration purposes.

The IJ entirely ignored this crucial affidavit. As noted at the outset of the January 16, 2008 hearing, more than half of the restitution has been repaid by the respondent's son in connection with litigation commenced by him in civil proceedings related to the hedge fund. If the respondent and her son are deported, it will cause irreparable harm to the investors -- it will cost the public million of dollars. In addition, the respondent's character witness testified at length about the prospects for the respondent and her efforts to make restitution.

Accordingly, the IJ erred and abused his discretion in failing to consider the positive public interest factors along with the negative ones. The equities on all three the factors enumerated under Section 209(c) favored the respondent and the waiver should be granted.

In conclusion, the proceedings below were marked by a disturbing deviation from the applicable legal standards that must be applied to an alien's request for a waiver pursuant to 8 C.F.R. § 1209.2(c). The IJ impermissibly considered the respondent's previous criminal conviction in the State of Indiana under the Matter of Jean balancing test, despite the fact that the conviction was not the criminal offense that rendered the

respondent inadmissible. In addition, the IJ impermissibly attributed inaccurate conduct to the respondent regarding her Indiana conviction.

Further, the IJ conducted a one-sided analysis of the respondent's instant conviction -- the conviction that has rendered her inadmissible -- and applied the wrong legal standard in this analysis.

The IJ wholly failed to follow the criteria set forth in the Matter of Jean, and failed to properly balance the offense to the hardships. Despite acknowledging that the respondent and her family would face "significant hardships," if deported, and further stated that "respondent has significant equities in this country." (I.J. at 16-17), he nonetheless relied on improper considerations and acted arbitrarily and capriciously in denying the respondent's application for a waiver under Section 209.

Had the IJ properly balanced respondent's hardships against her minimal acts with regard to the conspiracy, he would have been compelled to grant the waiver.

**II. The IJ applied an improper legal standard and factual analysis in determining that respondent's conviction was for a particularly serious crime thereby pretermitting her application for withholding of removal**

A. Legal standard for determination of a particularly serious crime

Respondent also applied for withholding of removal under section 241(b)(3) of the INA. The regulation is found under 8 C.F.R. § 1208.16(b) and (e). See Islami v. Gonzales, 412 F.3d 391,395 (2d Cir. 2005); and Zhou Yun Zhang v. INS, 386 F.3d 66, 71 (2d Cir. 2004). See also INS v. Cardoza-Fonseca, 480 U.S. 421, 436-37 (1987). However, the IJ was further required to determine whether the respondent's conviction constituted a "particularly serious crime," under 8 U.S.C. § 1231(b)(3)(B). The IJ was required to consider the four factors enumerated under Matter of Frentescu, 18 I. & N. Dec. 244 (BIA 1982). Failure to weigh all four Frentescu factors, specifically the fourth factor "constitutes an unjustified deviation from the standard applied in prior BIA cases." Steinhouse v. Ashcroft, 247 F.Supp.2d 201, 210 (D.Conn.2003) (citing Yousefi v. INS,

260 F.3d 318, 330 (4th Cir. 2001)), Benabdelmoutaleb v. Ashcroft, 2005 U.S. Dist. Lexis 39200 (E.D.N.Y. May 20, 2005)

The Frentescu factors consist of the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.

In Yousefi v. INS, 260 F.3d 318, 329-30 (4th Cir. 2001), the Fourth Circuit stated that "[t]he last two factors are the most important because unless they are considered, the record has not been 'analyzed on a case-by-case basis,' as is required by Frentescu." Id. Further, the fourth Frentescu factor has traditionally been regarded as the most important consideration in determining whether a crime is particularly serious. Therefore, Courts have held that an IJ or the Board's "failure to consider the fourth Frentescu factor constitutes an unjustified deviation from the standard applied in prior BIA cases." See Steinhouse, supra at 210; and Yousefi, supra at 330 ("because the Board failed to consider the two most important Frentescu factors and relied on improper considerations, we conclude that the Board's decision was arbitrary and capricious.").

B. Application of Frentescu factors to respondent

In this matter, the IJ erred by applying a wrong and incomplete standard in determining that respondent's conspiracy conviction constituted a "particularly serious crime." Steinhouse v. Ashcroft, 247 F.Supp.2d 201, 210 (D.Conn. 2005). The IJ failed to properly consider the circumstances and underlying facts of the conviction. Further, the IJ failed altogether to consider whether respondent presented a danger to the community, the fourth and most important Frentescu factor. Finally, the IJ failed to allow testimony and introduction of evidence about "mitigating circumstances surrounding the criminal conduct" which would have been relevant. See Jian v. INS, 28 F.3d 256, 258 (2d Cir. 1994); and Kazlauskas v. INS, 46 F.3d 902, 07 (9th Cir. 1995).

Under the first Frentescu factor, the nature of the conviction, the respondent's crime did not involve any violence, and was simply for a minimal to minor role in a conspiracy to commit wire fraud.

Under the second factor, the circumstances and underlying facts of the conviction, the respondent was given a three level reduction under the U.S.S.G. for having played between a minimal to minor role in the conspiracy. Essentially, she sat in on meetings involving her son, during which her son, or her son's partners were making misrepresentations, and she did nothing to correct them. Her testimony demonstrated the limited acts such participated in.

Under the third factor, the type of sentence imposed, the respondent was sentenced to a term of imprisonment of two years, followed by three years supervised release (i.e., probation). This sentence was well short of the maximum of five years the sentencing Court could have imposed, and the three years supervised release was mandatory, and again, the sentencing Court found the respondent's role to be between minimal and minor.

Under the fourth factor, there was never a threat of violence in this conspiracy. In addition, the impact on the community to be considered is the role of respondent's activities, not the conspiracy as a whole. The circumstances of the crime were that respondent merely failed to correct statements regarding her family's wealth made in her presence. It is important to note that the respondent was released on a $10,000 bail after she pled guilty in the conspiracy. The sentencing court was required under 18 U.S.C. § 3143 (bail pending sentence) to find, and did find, by clear and convincing evidence, that the respondent did not pose a danger to the community or a risk of flight.

Therefore, the respondent is not a danger to the community, and under Steinhouse, 247 F.Supp.2d at 210 and Yousefi, 260 F.3d at 329-30, the IJ acted arbitrarily and capriciously in failing to consider the fourth factor. Had he properly considered all four of the required factors, respondent's conviction could not have been considered to be particularly serious.

**III. The decision of the immigration judge denying withholding of removal and/or withholding of removal and/or withholding of removal under Article 3 of the Convention Against Torture is erroneous in viewing the record as a whole.**

The review of an IJ's decision on asylum/withholding/CAT claims will be subject to de novo review on nonfactual issues and the clearly erroneous standard regarding factual issues, including the credibility of testimony. 8 C.F.R. § 1003.1(d)(3). De novo review will apply to the application of legal standards.

A. Numerous key factual findings were clearly erroneous

In his decision, the IJ states that "the only thing she mentioned is an incident in 1982 seven years before she left Turkey when she claimed on her application she was slapped and insulted." I.J. at 13. To the contrary, the overwhelming weight of the record, is that the respondent was placed in the middle of a conflict between the PKK and the Turkish authorities. The IJ erroneously found that the respondent "decided to leave Turkey because the PKK suspected her of disloyalty, even though she had treated members of the PKK in 1982." I.J. at 3. However, a review of the respondent's affidavit and the relevant portions of the transcript indicate that she had treated PKK and local Turkish authorities all throughout 1982 to 1989 and that she was targeted by both sides of the conflict. This is more than a mere slapping and suffering insults.

In sum, the IJ reached and re-litigated the respondent's 1998 grant of asylum by IJ Joyce, despite advising counsel and the respondent during the hearing, "I don't want to re-litigate. I mean, I -- it seems like she's had a fairly detailed affidavit about what she said happened to her. I assume Judge Joyce found her credible." Tr. at 35.

Next, the IJ erroneously concluded, in what appears to be an adverse credibility finding, that what the respondent did with her house, her storage house, and belongings when she left Turkey 19 years ago was the subject of inconsistent testimony. The IJ stated, in relevant part, "She was asked a question about what she did with her house ... But then there's a section in the brother's -- brother-in-law's affidavit in Exhibit 6, Tab B, page 64. When the respondent was confronted about this statement in her brother-in-law's

letter, she said, well, now, that is true. The Court finds this to be a serious and significant inconsistency ..." I.J. at 12-13.

There are several problems with this finding. A review of the relevant portions of the transcript reveals confusion between the IJ and the respondent as to which house or storage house was taken and/or sold. Tr. at 83-85.

In essence, the IJ was questioning respondent about two houses: the respondent's home and storage. The respondent testified that she and her husband sold everything. Tr. at 83. However, the IJ faulted her for not detailing the fact that her "storage" home was, in fact, not sold. The IJ, however, did not dispute that some of the respondent's property was seized after her flight from Turkey. "They were harassing very much as Kurdish." Tr. at 84. Here, it is unclear from the testimony and the IJ's statements, which house seizure he was questioning.

Accordingly, the IJ's contention here was without merit. As an initial matter, the respondent's testimony here, was vague, and could not be used as a basis for the IJ's determination. See Daneshvar v. Ashcroft, 355 F.3d 615, 622 (6th Cir. 2004) (citing Hamana v. INS, 78 F.3d 233, 235 (6th Cir. 1996) and Amadou v. INS, 226 F.3d 724, 727 (6th Cir. 2000)).

Second, the events in question happened in 1989 -- nineteen years ago. In addition, as noted in the medical records of the respondent, she has suffered a stroke (2001) and two heart attacks in the past seven years. Finally, correction of such minor inconsistencies as between the house and the storage home, were not important in light of their relation to the respondent's claims. See Zhong v. U.S.D.O.J., 480 F.3d 104, 129 (2d Cir. 2007) (finding "that corrected dates ... are relatively minor inconsistencies in the context of an eight year chronology.").

Moreover, this determination "must be based on issues that go to the heart of the applicant's claim." Sylla v. INS, 388 F.3d 924, 926 (6th Cir.2004). Additionally, "while an IJ's application of the maxim falsus in-uno, falsus in omnibus may at times be appropriate, an applicant's testimonial discrepancies -- and, at times, even outright lies -- must be weighed in light of their significance to the total context of his or her claim of persecution." Zhong v. U.S.D.O.J., 480 F.3d 104, 127 (2d Cir. 2007) (citing Secaida-Rosales v. INS, 331 F.3d 297, 308 (2d Cir. 2003); see also Diallo v. INS, 232 F.3d 279,

288 (2d Cir. 2000); Matter of O-D-, 21 I&N Dec. 1079, 1081-83 (BIA 1998); and Yongo v. INS, 355 F.3d 27, 33 (1st Cir. 2004) ("obviously there are some lies that, because of their circumstances and limited relationship to the main issue, do relatively little to discredit other statements.").

Therefore, testimonial inconsistencies are not sufficient as the sole basis of denial of asylum or withholding, but rather matters collateral or ancillary to the claim. Secaida-Rosales, 331 F.3d at 308; and Borovikova v. U.S. Dep't of Justice, 435 F.3d 151, 167 (2d Cir. 2006).

In this instance, the IJ's finding of an inconsistency because the respondent was confused between her home and storage house -- events that took place nineteen years ago -- was of no moment to the credibility of the respondent's claims. In point of fact, the respondent was not once questioned about the details of her persecution as listed in her affidavit attached to her application (Exhibit 5).

Here, the IJ based part of his decision on the respondent's confusion over her home and her storage house-events that took place nineteen years ago -- and that was not a sufficient basis for him to deny the respondent withholding of removal under the INA or under Article 3 of the Convention Against Torture ("CAT"). Finally, this principle inherently includes a dimension of proportionality, i.e., that the IJ or properly assessed the scale of the inconsistency in the context of the balance of the alien's testimony. See Alvarado-Carillo v. INS, 251 F.3d 44 (2d Cir. 2001). Further, "unclear testimony may not serve as substantial evidence for an adverse credibility finding." Guo v. Ashcroft, 361 F.3d 1194, 1200 (9th Cir. 2004).

It was reversible error for the IJ to give no "weight or any credibility whatsoever" to the brother-in-law's letter. I.J. at 13. The IJ premised this position on only one item: "One of the articles on which claims [brother-in-law] that respondent would be convicted under, namely, Article 430, according to the expert [Dr. Michael Gunter], is no longer the law in Turkey." I.J. at 13. There were no other reasons given to discredit the respondent's brother-in-law's lengthy affidavit.

As an initial matter, the brother-in-law's affidavit (Exhibit 6), states in relevant part, as follows:

Paragraph 18. As a result of the Yalincak family's flight from Turkey and application for political asylum in the United States in 1998, they face criminal prosecution under Article 301, upon return to Turkey, under the Turkish Penal Code, and the aforementioned Law No. 430. Their crime is treated, in the United States equivalent of "snitching" on their own country. Article 301 criminalizes any act that "insults Turkishness, or defames Turkey" and Law No. 430 criminalizes the flight of any Kurd from the Kurdish region, without express permission of the military governor, or local authority.

The IJ hones in on the brother-in-law's reference to Law No. 430. However, the brother-in-law's references to Article 301, (para. 18, 10(b) and (c)), Article 220 and 22 were completely credited by the expert, Dr. Michael Gunter. Tr. at 91-107.

Moreover, the IJ's findings on Article 430 is even more problematic. The respondent and her family left Turkey in 1989, when as evidenced by the expert witnesses testimony, Article 430 was still in force. The fact that it is obsolete now, does not necessarily render past violations "obsolete." And, as the expert witness further testified it is very probable that she would be prosecuted under Article 220, 222, or 301. Tr. at 91-107. In addition, both the respondent's expert witness and character witness, who is also familiar with Turkey, testified that many of the changes in Turkey's laws were in "theory" and not in practice.

Finally, the brother-in-law's affidavit includes numerous references to public documents and sources that, in fact, report the very information the affidavit is describing. An example would be, the numerous Articles written about the respondent and her family's asylee status in the United States. Further, many of the references to the Articles -- public documents -- should have led the IJ to take judicial notice. Instead, the IJ erroneously concluded, "But there is no evidence the authorities in Turkey knew she applied for asylum." I.J. at 15.

Ironically, on February 5, 2008, less than three weeks after the IJ's decision, various newspapers reported the news of entered against the respondent, as well as, her asylee status in this country. In sum, the IJ's complete ignorance of the brother-in-law's affidavit does not hold up under the standards discussed in Alvarado-Carillo v. INS, 251 F.3d 44 (2d Cir. 2001), Zhong v. U.S.D.O.J., 480 F.3d 104, 127 (2d Cir. 2003), Yongo v. INS, 355 F.3d 27, 33 (1st Cir. 2004), Secaida-Rosales v. INS, 331 F.3d 297, 308 (2d Cir. 2003), and Borovikova v. U.S. Dep't of Justice, 435 F.3d 151, 167 (2d Cir. 2006).

The brother-in-law's affidavit, with its references to numerous public documents, coupled with the expert witness, and as well as, the past finding by IJ Joyce of past persecution and his grant of asylum in 1998, established with uncontroverted evidence, past persecution, and fear of future persecution.

B. The IJ improperly concluded that respondent failed to demonstrate a likelihood of persecution

Further, the IJ stated that he would not re-litigate the respondent's past grant of asylum (Tr. at 35), however, he did exactly that. The IJ completely ignored the previous findings of IJs Cuevas and Joyce with regard to the respondent's previous 1995 licensing violation and findings of past persecution and ignored the testimony from the expert witness, which indicated a significant probability of future persecution.

Finally, the IJ erroneously concluded contrary to IJ Joyce's conclusion in 1998, that the respondent was only "slapped and insulted" and "[t]he Court again does not find this is sufficient to establish past persecution." I.J. at 13. The IJ's conclusion was highly prejudicial and constituted a re-litigation of IJ Joyce's findings in 1998 and, further, was contrary to well established case law. Indeed, the respondent's 1998 affidavit (Exhibit 5), and 1998 hearing revealed a lot more than the respondent being "slapped and insulted," yet because the IJ stated that he did not want to "re-litigate" -- he completely turned a deaf ear to a seven year period, from 1982 to 1989, during which the respondent was routinely detained, interrogated, and placed under surveillance. Accordingly, the IJ treated IJ Joyce's past grant of asylum as meaningless, a non-event.

The respondent's expert witness, Dr. Gunter, whom the IJ credited, explicitly stated that the respondent faced a threat of future persecution.

Next, the IJ found that the respondent's husband "indicated that there were no direct attacks against either he or his wife." I.J. at 3. The IJ completely ignored the substantial testimony contained within respondent's affidavit, her testimony and that of her expert witness.

C. The IJ improperly concluded that respondent failed to merit withholding of removal pursuant to Article 3 of the Convention Against Torture

Article 3 of the Convention Against Torture ("CAT") provides that "no State party shall expel [or] return ... a person to another State in which there are substantial grounds for believing the person would be in danger of being subject to torture." United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, adopted Dec. 10, 1984, 85. Torture is or suffering that is perpetrated or authorities." See Wang v. Ashcroft, 320 F.3d 130, 134 (2d Cir. S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. defined as the "intentional infliction of pain sanctioned by a nation's 2003); see also Khouzam v. Ashcroft, 361 F.3d 161, 170 (2d Cir. 2004); and Perez v. Loy, 356 F.Supp.2d 172, 178-79 (D.Conn. 2005).

The governing regulations provide that once an alien establishes that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal," the United States may not remove him or her to that country. 8 C.F.R. § 208.16(c)(2). Further, because

Further, the regulations require the BIA to consider all evidence of possible torture proffered by the alien, regardless of the weight it accords the alien's testimony. Moreover, because the CAT inquiry is independent of the asylum analysis, however, the Board's decision with respect to an alien's claims for asylum and withholding of removal pursuant to the INA should never, in itself, be determinative of the alien's CAT claim. See Kamalthas v. INS, 251 F.3d 1279, 1283 (9th Cir. 2001); and 8 C.F.R. § 208.16(c)(3). Consequently, an alien's CAT claim may be established using different evidence and theories than the alien's INA claims. The CAT claim, therefore, must always be considered independently of the alien's claims under the INA. The CAT regulations reflect the independence of the INA and CAT as avenues of relief from removal, as well as CAT's objective focus, by requiring the agency to consider "all evidence relevant to the possibility of future torture," including evidence of current country conditions, without requiring any specific type of showing. See Ramsameachire v. Ashcroft, 357

F.3d 169, 185 (2d Cir.2004). An adverse credibility finding made in the asylum context should not affect an alien's CAT claim. Ramsameachire, at 185.

With respect to the respondent's request for Withholding of Removal under Article 3 of the Convention Against Torture ("CAT"), the IJ committed reversible error. The Court reviewed the State Department report on Turkey which indicated that even though torture is banned, members of the security forces to continue to torture, beat, and otherwise abuse persons. I.J. at 10.

The IJ ignored the respondent's expert witness testimony, that "[i]t would not be inconceivable that somebody would kill her." Tr. at 17-18. Dr. Gunter, during cross-examination, stated that torture was prevalent and that Turkey was being fined every month by the European Court of Human Rights. Tr. at 102-03. Dr. Gunter testified at length about the numerous sections of the Turkish penal code that she could be charged with for having sought asylum in the United States. Tr. at 93-94, 99, 103. The respondent herself testified she is subject to arrest upon arrival at the airport in Turkey. Tr. at 69. Further, the IJ ignored the immense media attention the respondent's case has received by speculating that such publicity was confined to her criminal conviction. As noted in the brother-in-law's affidavit, there are numerous website references to the respondent's criminal conviction and her asylee status in this country. Indeed, the affidavit, once the IJ's errors are "excised -- cannot be completely discounted." See Zhong v. U.S.D.O.J., 480 F.3d 104, 132 (2d Cir. 2007). Internet articles from the USA Today, the New York Post, the Hartford Courant, and the Washington Square News, are all available to Turks and Americans alike.

Rather, the IJ based his "more likely than not" analysis on impermissible conjecture and speculation.